**In re ERIE MARINE ENTERPRISES, INC., Debtor.**

**ERIE MARINE ENTERPRISES, INC., Plaintiff,**

v.

**NATIONSBANK, N.A. and the Jonathan Corporation, Defendants.**

Bankruptcy No. 95–10597.
Adversary No. 95–1103.

United States Bankruptcy Court, W.D. Pennsylvania.

Jan. 8, 1998.

Lawrence C. Bolla, Erie, PA, for Debtor.

Matthew W. Levin, Atlanta, GA, for Nationsbank, N.A.

William A. Lascara, Norfolk, VA, for Jonathan Corporation.

## OPINION

WARREN W. BENTZ, Bankruptcy Judge.

Erie Marine Enterprises, Inc. ("Debtor") filed a voluntary Petition under Chapter 11

of the Bankruptcy Code on July 20, 1995. On December 27, 1995, Debtor filed the within multi-count Complaint against its parent, The Jonathan Corporation ("Jonathan") and Nationsbank, N.A. ("Bank").

The Debtor advances several theories to recover funds from the Bank.[1] In Count I, Debtor alleges a constructive trust remedy; Count II, resulting trust; Count III, equitable lien; Count IV, preferential transfer; Count V, fraudulent transfers pursuant to 11 U.S.C. § 548 and 550(b); and Count VI, fraudulent transfers pursuant to 12 Pa.Cons. Stat.Ann. § 5101 to 5110.

Presently before the Court are the Debtor's Motion for Partial Summary Judgment as to Counts IV, V and VI and the Bank's Motion for Summary Judgment on all counts of the Complaint.

We have considered the numerous briefs and exhibits filed in this matter and heard arguments of counsel. We find that there are no material issues of fact and that the Bank is entitled to summary judgment.

### Facts

Debtor was incorporated in 1991. Jonathan owned 80% of the Debtor's stock. Gary Bowers ("Bowers") served as president of both Jonathan and the Debtor. Bowers owned 70% of the stock of Jonathan.

The Bank served as Jonathan's primary lender. Both Bowers and his wife executed personal guarantees of Jonathan's loan obligations to the Bank.

Debtor was one of Jonathan's subsidiaries. Debtor's accounting functions were handled from Jonathan's offices in the same manner in which it handled the accounting functions of other subsidiaries. Jonathan paid the Debtor's bills and collected its receivables. Debtor invoiced its customers and sent copies of the invoices to Jonathan. Most of Debtor's customers made payment to the Debtor by mailing checks to Jonathan's offices. In circumstances where customer checks were mailed to the Debtor, Debtor forwarded the checks to Jonathan. Similarly, Debtor forwarded bills which it received from its vendors to Jonathan for payment.[2] Debtor's obligations, including its payroll, were paid directly by Jonathan.

At Debtor's inception in 1991, Jonathan loaned or gave numerous pieces of equipment to the Debtor which it needed to carry out its business. All of the Debtor's working capital was provided by Jonathan. Jonathan infused substantial amounts of money into the Debtor's operation. Debtor's operation was seasonal. Debtor's receivables increased during the winter months when most of its customers had work completed and decreased during the spring as it collected on the prior winter's receivables.

Transactions between Jonathan and the Debtor were recorded in an intercompany account. Jonathan's payment of Debtor's bills and the value of services provided by Jonathan to Debtor was booked as an intercompany loan.[3] The intercompany account was reduced by the amount of the receivables which Jonathan collected on behalf of the Debtor.

The winter of 1994–1995 was the Debtor's best year as far as the amount of work it obtained from customers. Jonathan provided Debtor with the working capital to complete its jobs. A year prior to the Debtor's bankruptcy, Debtor owed Jonathan $4,042,852. By February, 1995, the amount due Jonathan from Debtor exceeded $5,000,000. As the Debtor collected its receivables for the work performed during the winter of 1994–1995, the balance due Jonathan decreased. On April 20, 1995, three months prior to the Debtor's bankruptcy filing, the balance was $4,363,746. As of the filing date, the balance was reduced to $3,743,247.

---

1. Debtor's claim against Jonathan is moot because it has no assets. The only issue is the liability of the Bank.

2. Debtor maintained a checking account in Erie which typically carried a $5,000–$10,000 balance to accommodate small cash purchases from local vendors.

3. A portion of Jonathan's office/overhead expense was allocated to the Debtor. The Debtor does not agree that the formula used and the amounts charged are correct. The difference is immaterial for the purpose of deciding the present cross-motions for summary judgment.

In June, 1995, Jonathan suffered an unanticipated setback. Its major customer refused to pay a substantial invoice and Jonathan was forced to cease operations. As a consequence, it could no longer finance the Debtor and the decision was made to shut down Debtor's operations.

### Bank's Relationship

The Bank was the primary lender for Jonathan. Jonathan began experiencing financial difficulties in 1991 or 1992. The Bank cooperated with Jonathan. The loans between Jonathan and the Bank were restructured on several occasions.

On January 29, 1993, Jonathan and its subsidiary, Tidewater Steel Company, Inc., and the Bank entered into a Third Amendment to a Third Master Loan Agreement. The Third Amendment established a Temporary Guidance Line of Credit (the "Guidance Line") which permitted Jonathan to borrow up to $500,000 to assist with short term cash flow needs.

In June, 1993, Jonathan sought to use the funds available under the Guidance Line for services to be provided by the Debtor on the M/V George A. Stinson. Prior to this time, there were no formal loan documents between the Debtor and Jonathan to evidence the intercompany obligation. The Bank requested a pledge of the Debtor's receivable on the Stinson job to secure the $500,000 additional loan. On June 28, 1993, Debtor signed a note in favor of Jonathan in the amount of $500,000 ("Stinson Note"). At the time the Stinson Note was executed, Debtor owed Jonathan approximately $3,000,000. The Stinson Note was secured by the receivable for work done on the M/V George A. Stinson. The Stinson Note and security agreement were assigned by Jonathan to the Bank as collateral for repayment of Jonathan's liability under the Guidance Line.

On December 10, 1993, Jonathan filed a Petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia ("Virginia Bankruptcy Court"). On December 13, 1993, Jonathan, Tidewater Steel and the Bank entered into a Postpetition Loan Agreement which was approved by the Virginia Bankruptcy Court under 11 U.S.C. § 364. As part of the postpetition loan agreement, Jonathan intended to utilize proceeds available under its revolving line with the Bank to provide the Debtor with a working capital revolving line of credit in the amount of $500,000. As a condition for providing money for that purpose, the Bank required Jonathan to obtain a note from the Debtor in the amount of $500,000 and a security agreement in the Debtor's accounts and inventory to secure the note and to assign the interest to the Bank.

On or about February 28, 1995, Jonathan exited bankruptcy with a confirmed plan of reorganization. As part of the reorganization plan, the Bank agreed to provide Jonathan exit financing. The terms of the exit financing are reflected in the Fourth Master Loan Agreement between Jonathan and the Bank dated March 23, 1995. The Fourth Master Loan Agreement amended and restated the obligations of Jonathan. It provided for the first time that the Debtor's receivables were included in the borrowing base formula which enabled Jonathan to borrow additional funds. The maximum amount of Jonathan's revolving loans remained at $5,000,000. The Bank's loan was secured by all collateral securing the prior loans and the assignment of Jonathan's rights under an "Erie Marine Line Note." Jonathan agreed to pledge to the Bank all of its rights under the "Erie Marine Line Note" in the amount of $5,000,000 which was executed by the parties at the closing date of the Fourth Master Loan Agreement. On March 23, 1995, Debtor executed a promissory note and security agreement in favor of Jonathan in the amount of $5,000,000 to evidence all advances previous and subsequent to the date of execution. As of March 23, 1995, Jonathan's books reflected a balance due of $4,467,581 from the Debtor.

The Fourth Master Loan Agreement provided that Jonathan would maintain its cash collateral account with the Bank and that it would deposit all collections, including collections from the Debtor's receivables into the account. Jonathan, just as it had done prior to the execution of the Fourth Master Loan Agreement, continued to put all of the cash it received into the cash collateral account.

The Bank had sole dominion and control and sole access to the cash collateral account.

Jonathan was required to continue to make periodic financial reports to the Bank which included a schedule of advances to and payments from the Debtor.

### Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure is made applicable to the adversary proceeding by Fed.R.Bankr.P. 7056. Fed.R.Civ.P. 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

In determining whether any genuine issue of material fact exists, the record "must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*

"Once it appears from the record that there are no genuine issues of material facts, the burden shifts to the opposing party to establish that genuine issues of material facts in fact exist." *In re Weinhardt,* 156 B.R. 677, 679 (Bankr.M.D.Fla.1993). The factual dispute necessary to defeat a motion for summary judgment must be genuine and the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *In re Tennessee Valley Steel Corp.,* 183 B.R. 795, 799 (Bankr. E.D.Tenn.1995). The court may grant summary judgment if the evidence opposing summary judgment is merely colorable or not significantly probative. *In re Chaplin,* 179 B.R. 123, 126 (Bankr.E.D.Wis.1995).

### Constructive Trust

A constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he retained it. *In re Kulzer*

*Roofing, Inc.,* 139 B.R. 132 (Bankr.E.D.Pa. 1992) (and cases cited therein). A constructive trust is imposed as an equitable remedy in situations where property has been acquired in circumstances that the holder of legal title may not in good conscience retain the beneficial interest. *Id.* The key consideration is whether the imposition of a constructive trust would avoid unjust enrichment. *In re Joseph B. Dahlkemper Co.,* 165 B.R. 149, 154 (Bankr.W.D.Pa.1994); *In re Visiting Nurse Ass'n. of Western Pennsylvania,* 101 B.R. 462, 464 (Bankr.W.D.Pa.1989), *aff'd.* 143 B.R. 633 (W.D.Pa.1992).

Debtor asserts that "it would be inequitable under the circumstances for the Bank to keep the funds which were removed from the Debtor."

From the inception of the Debtor's operation in 1991, Jonathan infused substantial cash in the Debtor's operation. Jonathan paid the Debtor's bills and collected the Debtor's receivables and applied the funds collected against the debt owed to Jonathan. The amounts collected by Jonathan were significantly less than Jonathan infused into the Debtor's operation. It is not disputed that the Debtor owed substantial sums to Jonathan. Jonathan did not collect amounts beyond what it was due and was not unjustly enriched by the collection of the Debtor's receivables. The proceeds of the Debtor's receivables were used to partially satisfy a valid debt owed to Jonathan. There is nothing in the record to indicate that Jonathan abused a confidential relationship to obtain in excess of what it was due. Likewise, the Bank's receipt of payments from Jonathan on its valid loans does not constitute unjust enrichment.

Count I of the Complaint must be dismissed.

### Resulting Trust

A resulting trust "arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest in the property." *Gray v. Leibert,* 357 Pa. 130, 134–35, 53 A.2d 132 (Pa.1947). "A resulting

trust is an equitable trust ... which imposes an obligation on the titleholder of property to hold it in trust for the beneficial owner." *Hornyak v. Sell*, 427 Pa.Super. 356, 360, 629 A.2d 138, 140 (Pa.Super.1993). Resulting trusts occur when an express trust has failed or when a transfer of property is paid for by another. *In re Penn Central Transportation Co.*, 484 F.2d 1300 (3d Cir.1973), *cert. den.* 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974).

■ Debtor does not allege the failure of an express trust and there has been no transfer of property paid for by the Debtor where the Debtor did not receive the property in question. Debtor alleges that it did not receive fair consideration for transfers from it to Jonathan.

There is no question that the funds collected by Jonathan were applied to reduce the valid debt owed by the Debtor to Jonathan. While Jonathan had routinely provided funds for the Debtor's operation, the payments to Jonathan in the form of the Debtor's receivable collections were not earmarked for the Debtor's use and Jonathan was free to use the collections as its own and commingle the funds collected with its own monies.

Count II must be dismissed.

### Equitable Lien

■ There is serious doubt as to whether there is authority for invoking an equitable lien theory to a transaction otherwise governed by specific provisions of the Bankruptcy Code. *See Small v. Beverly Bank*, 936 F.2d 945, 949 (7th Cir.1991) (Equitable liens are contrary to the policy of bankruptcy law); *In re Trans World Airlines, Inc.*, 180 B.R. 389, 402 n. 18 (Bankr.D.Del.1994) *rev'd. on other grounds*, 203 B.R. 890 (D.Del.1996) (Expressing doubt that equitable lien theory is cognizable in the bankruptcy context). We need not decide if an equitable lien theory is applicable because the facts alleged here would not support a finding of an equitable lien even if the theory exists, i.e., there was never an obligation by the Bank to the Debtor; there was never an agreement by any of the parties that a lien should exist; and there was never an identifiable res to which a lien could attach.

Further, the Debtor points to no evidence to establish an obligation on the part of Jonathan to fund the Debtor's operating expenses. The obligation ran the other way. Debtor had an obligation to Jonathan for amounts Jonathan expended on behalf of the Debtor which far exceeded the amount of money Jonathan collected. There was no unjust enrichment.

Count III must be dismissed.

### Preference

■ For purposes of the preference count, we will assume that the transfer of a security interest in the Debtor's assets to Jonathan on March 23, 1995 was a preference, although outside the 90 day period, because Jonathan is an insider. The issue is whether the preference is recoverable from the Bank. The Bank asserts that it is protected by 11 U.S.C. § 550(c) which provides:

> (c) If a transfer made between 90 days and one year before the filing of the petition—
>
> (1) is avoided under section 547(b) of this title; and
>
> (2) was made for the benefit of a creditor that at the time of such transfer was an insider;
>
> the trustee may not recover under subsection (a) from a transferee that is not an insider.

11 U.S.C. § 550(c).

Following the statutory language of § 550(c), the security interest was transferred to Jonathan between 90 days and one year before the filing of the Debtor's Petition; the Debtor seeks to avoid the transfer under § 547(b); and the transfer was made for the benefit of a creditor (Jonathan) and Jonathan was an insider. Therefore, the Debtor may not recover the avoided transfer from the bank as a transferee because the bank is not an insider.

The Debtor asserts that the transfer did not occur until the Debtor's receivables were realized and, therefore, § 550(c) does not protect the Bank as to those receivables collected within 90 days of the Debtor's bankruptcy filing.

The Bank asserts that it is protected by § 550(b) for the transfers, if any, which occurred during the 90 day preference period. § 550(b) provides that the Debtor cannot recover a transfer avoided as a preference under § 547 from any immediate or mediate transferee of an initial transferee if the immediate or mediate transferee took from the initial transferee "for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1).

The Debtor asserts that the Bank "is not protected by § 550(b)(1) because Jonathan served as a mere conduit and that the Bank must therefore be considered the initial transferee. The Debtor's position is without merit."

The Debtor's customers were instructed to forward their payments directly to Jonathan or when the Debtor received payments from its customers it forwarded the checks to Jonathan. The purpose of Jonathan receiving the payments was to enable Jonathan to receive payment on the intercompany receivable, the amounts the Debtor owed Jonathan. The funds were not earmarked for the Bank. When Jonathan received the funds, it had complete dominion and control over the monies and the Debtor retained no interest or control. Jonathan was free to elect how to use the funds. Jonathan elected to honor its agreement with the Bank and deposit the funds in its cash collateral account. The Debtor did not have a business relationship with the Bank and was not a party to the agreement between Jonathan and the Bank. Jonathan was a creditor of the Debtor and not merely an agent or conduit who held funds for an undisclosed principal. As a consequence, the Bank is a subsequent transferee from Jonathan and may avail itself of the protections of § 550(b). *See In re Columbia Data Products, Inc.,* 892 F.2d 26 (4th Cir.1989).

Section 550(b) requires the subsequent transferee to show that it took the avoided transfers for value, in good faith and without knowledge of the avoidability of the transfers in order to avoid liability under § 550(a). There is no dispute that any monies that Jonathan transferred to the Bank were in satisfaction of Jonathan's debt to the Bank. Jonathan clearly received value for the transfers in question.

"Knowledge" as used in § 550(b)(1) is not defined in the Bankruptcy Code. Its meaning has been interpreted by the courts. As stated in *Smith v. Mixon,* 788 F.2d 229 (4th Cir.1986):

> Although "knowledge" as used in § 550(b)(1) is not defined in the Code or in the legislative history, we conclude that it does not mean "constructive notice." As several courts have noted when analyzing § 544 of the bankruptcy code, "[t]he term 'notice' may include either actual or constructive notice, while the term 'knowledge' includes only actual notice. That Congress selected the term 'knowledge' is significant." *In re Richardson,* 23 B.R. 434, 439 (Bankr.D.Utah 1982); accord *In re Euro–Swiss International Corp.,* 33 B.R. 872, 881 (Bankr.S.D.N.Y.1983); *In re Kelly,* 29 B.R. 708, 710 (Bankr.D.Me.1983); *see also McCannon v. Marston,* 679 F.2d 13, 16–17 (3d Cir.1982) (error to equate knowledge with notice). We believe that this reasoning applies with equal force to § 550(b)(1) of the Code.

*Id.* at 232.

*In re Sherman,* 67 F.3d 1348 (8th Cir.1995) provides at 1357:

> Neither the Bankruptcy Code, nor its legislative history, defines knowledge as used in § 550(b)(1). *Smith v. Mixon,* 788 F.2d 229, 232 (4th Cir.1986). "No one supposes that 'knowledge of voidability' means complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable; some lesser knowledge will do." *Bonded Fin. Servs.,* 838 F.2d at 898 (citations omitted). However, knowledge is a stronger term than notice, and we do not require a transferee to be a vigilant monitor for the creditors' benefit when he possesses no information suggesting that there is a fraudulent conveyance in the chain. *Id.* Accordingly, we believe that a transferee has knowledge if he "knew facts that would lead a reasonable person to believe that the property trans-

ferred was recoverable." *In re Nordic Village, Inc.*, 915 F.2d 1049, 1055 (6th Cir. 1990) (quoting *Smith*, 788 F.2d at 232 n. 2), *rev'd* on other grounds sub nom. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). In this vein, some facts suggest the underlying presence of other facts. If a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge. In such a situation, the transferee is held to have knowledge of the voidability of the transfer. *In re Agricultural Research & Technology Group*, 916 F.2d at 536; *Bonded Fin. Servs.*, 838 F.2d at 898; *In re Goodwin*, 115 B.R. 674, 677 (Bankr.C.D.Cal.1990).

*Id. See also Bonded Financial Services Inc. v. European American Bank*, 838 F.2d 890 (7th Cir.1988); *In re Consolidated Capital Equities Corp.*, 175 B.R. 629 (Bankr.N.D.Tx. 1994).

The Bank did not "sit on [its] heels, thereby preventing a finding that [it] had knowledge." The Bank's relationship was with Jonathan. It knew that Jonathan owned the majority of the Debtor's stock and knew of the arrangement for Jonathan to collect the Debtor's receivables and to pay the Debtor's bills. It required that Jonathan provide financial information on the transactions between Jonathan and the Debtor.

With the Bank's support, Jonathan had recently emerged from its own bankruptcy under the terms of a confirmed plan of reorganization and was on the road to recovery. The Debtor's obligations were generally being paid as they came due with Jonathan's continued support and as had always been the practice, the proceeds of the Debtor's receivables were being used as payment on the Debtor's intercompany loan to Jonathan.

 Jonathan's demise was not contemplated. Its sudden death occurred when a large customer refused to pay. Neither Jonathan, the Debtor, or the Bank could have anticipated Jonathan's sudden crisis. Therefore, the Bank had no reason to believe and

did not have knowledge that the payments from the Debtor to Jonathan and the subsequent payments from Jonathan to the Bank might be recoverable as preferences.

The phrase "good faith" in § 550(b) is intended to prevent a transferee from whom the trustee could recover from transferring the recoverable property to an innocent transferee, and receiving a transfer from him, that is, "washing" the transaction through an innocent third party. In order for the transferee to be excepted from liability ... he himself must be a good faith transferee.

H.R.Rep. No. 95-595, 95th Cong., 2d Sess. 376 (1978), S.Rep. No. 95-989, 95th Cong., 2d Sess. 90 (1978), *U.S.Code Cong. & Admin. News 1978*, pp. 5787, 5876, 6332. A subsequent transferee has no duty to commence its own investigation into the voidability of the initial transfer in the absence of inquiry notice that the initial transfer may be voidable. *Bonded Financial*, 838 F.2d at 897.

We conclude that the Bank was a subsequent transferee that took for value, in good faith, and without knowledge of the voidability of the transfer from the Debtor to Jonathan. Accordingly, Count IV must be dismissed.

### Fraudulent Transfer

The Debtor seeks to avoid the security interest in its receivables taken by Jonathan and assigned to the Bank on March 23, 1995 on both an "actual fraud" theory and a "constructive fraud" theory. The "actual fraud" provisions of 11 U.S.C. § 548(a)(1) and 12 Pa.C.S.A. § 5104(a)(1) provide that transfers are avoidable to the extent they are made with actual intent to hinder, delay, or defraud creditors. The "constructive fraud" provisions of 11 U.S.C. § 548(a)(2) and 12 Pa. C.S.A. § 5104(b) provide that a transfer is constructively fraudulent where the debtor received less than a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time or became insolvent as a result of the transfer.

For purposes of the fraudulent conveyance section of the Bankruptcy Code, "value" is defined as "property, or satisfaction or secur-

ing of a present or antecedent debt of the debtor...." 11 U.S.C. § 548(d)(2)(A). The language of the Pennsylvania Fraudulent Transfer Act, 12 Pa.C.S.A. § 5103 is similar.

■ Here, Debtor gave Jonathan a security interest for the purpose of securing a present or antecedent debt. The transfers by the Debtor served simply as repayment for money received. Thus, the transfer was made in exchange for reasonably equivalent value and does not constitute a fraudulent transfer under the "constructive fraud" theory.

The Debtor alleges that it is entitled to recover from the Bank as a fraudulent transferee under an "actual fraud" theory. In order to recover under an "actual fraud" theory, the Debtor must prove that the transfer was made with the intent to hinder, delay or defraud creditors.

We think that the facts reflect just the opposite of an actual intent to hinder, delay or defraud creditors. The purpose of the granting of the security interest was not to leave the Debtor unable to meet its obligations, but rather to enable Jonathan to restructure its loans with the Bank which would enable Jonathan to exit bankruptcy with a confirmed plan of reorganization approved by the Virginia Bankruptcy Court, continue on its road to recovery, and continue to provide funds for the Debtor's operation. It is difficult to perceive how the payments made by the Debtor to Jonathan on a debt which was justly owed can be tortured into an act done with the intent to hinder, delay and defraud creditors.

Certainly, the Bank was aware that Jonathan was providing working capital to support the Debtor's operation and aware that Jonathan was collecting the Debtor's receivables to apply towards the intercompany loan account. The Debtor's cash flow needs were met by Jonathan right up until the time of Jonathan's unexpected collapse in June, 1995. In this fashion, the Debtor's obligations were generally being paid as they became due.

■ Even if the transfers of the proceeds of the Debtor's receivables could be avoided as a fraudulent conveyance to Jonathan, the Bank is protected by § 550(b). As discussed in connection with the preference Count of the Complaint, the Bank was a subsequent transferee which took for value, in good faith and without knowledge of the avoidability of the transfers in question. Under § 550(b), the transfers cannot be recovered from "a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith and without knowledge of the voidability of the transferee ..." 11 U.S.C. § 550(b)(1).

As evidence of the Bank's actual fraudulent intent, Debtor points to the handwritten notes of Donald Tate ("Tate"), the officer at the Bank assigned to the Jonathan account, which contain the words "fraudulent conveyance." Tate testified concerning the notes at his deposition:

Q In your mind when you worked with NationsBank and Jonathan on this account in March of '95, without getting into what you told the lawyers or without getting into what the lawyers told you, from everything you knew at that point in time there was a concern in your mind whether what was being done here with respect to Erie receivables would constitute a fraudulent transfer?

A I don't think that any fear particularly developed in my mind. I would say I always discussed those kind of issues with counsel.

Q I'll show you what I've marked as Plaintiff Exhibit 40–A.

A Uh-huh (affirmative).

Q You see the word here?

A Fraudulent conveyance.

Q And is that your handwriting?

A That's my handwriting.

Q And there's an arrow there from fraudulent conveyance up; right?

A Uh-huh (affirmative).

Q And what does that say above that?

A Beef up notes.

Q And isn't that what Jonathan did with respect to Erie Marine, beef up the notes?

A Made the note larger.

Q From 500,000 to 5 million?

A They made the note larger.

Q So you take it from looking at your own notes that you were having some thoughts or discussions about fraudulent transfer with respect to this transaction?

A I was probably—again—

Q Don't get into what you talked about with counsel.

A Okay. Well, I can't make any more comments.

Q Without saying what you told to counsel or what counsel told to you, with respect to this transaction when it went down on behalf of the bank, the issue of fraudulent transfer was in your mind in connection with what occurred?

A It was in my mind?

Q Yeah.

A Indicating it could come from any source?

Q No, no. Indicating it could have come from any source, but it's a concern you had at that time?

A I don't think it was a concern. It was something that I can't say wasn't in mind from some source.

At best, this testimony shows that the question of fraudulent conveyance was considered by the Bank and that the Bank determined that under the facts of this case, that it could appropriately go forward with the loan. We do not find it unusual that the Bank would consider fraudulent conveyance issues in making loans of this type, but conclude that such considerations do not indicate a lack of good faith.

Accordingly, the Bank is entitled to summary judgment on the fraudulent conveyance counts of the Complaint.

### Conclusion

Having determined that the Bank is entitled to summary judgment on all counts of the Complaint, its Motion for Summary Judgment must be granted and the Debtor's Motion for Partial Summary Judgment must be refused. An appropriate Order will be entered.

## ORDER

This 8th day of January, 1998, in accordance with the accompanying opinion, it shall be, and hereby is, ORDERED as follows:

1. The Motion for Partial Summary Judgment filed by Erie Marine Enterprises, Inc. is REFUSED.

2. The Motion for Summary Judgment filed by Nationsbank, N.A. is GRANTED and the within Complaint is DISMISSED.