Carlotta M. BOHM, Trustee for Howard E. Hammonds, Jr., Debtor, and International Marketing and Procurement Services, Debtor, Plaintiffs,

v.

COMMERCE UNION BANK OF TENNESSEE, Defendant.

Civ. A. No. 87–1881.

United States District Court, W.D. Pennsylvania.

June 16, 1992.

Victor E. Vouga, Butler, Pa., for plaintiff.

Robert A. King, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

LEWIS, District Judge.

Pending before the court is a motion for summary judgment filed by defendant Commerce Union Bank of Tennessee ("Commerce"). For the following reasons, the motion will be granted in part and denied in part.

### FACTS

International Marketing & Procurement Services ("IMPS") is a licensed export trading company. IMPS obtains purchase orders from foreign buyers for specific products and, in turn, purchases those products from American manufacturers for shipment overseas, primarily to Saudi Arabia. Howard Hammonds owns 65% of the IMPS stock and Tom Hammonds, his brother, owns 35% of the shares.

On December 29, 1983, IMPS applied for and was approved for a Small Business Administration ("SBA") guaranteed loan from Equibank, a bank headquartered in Pittsburgh, Pennsylvania. The loan was a revolving line of credit for $500,000. It was divided into an inventory line for disbursements of up to $400,000, and a working capital line for disbursements of up to $100,000.

To draw upon the inventory line, IMPS would obtain a purchase order from a foreign buyer, issue its own purchase order to a domestic manufacturer, and request that Equibank disburse the loan proceeds directly to the manufacturer. While the product was being manufactured, but before ship-

ment, IMPS would obtain a letter of credit and assign the proceeds to Equibank. After the goods were shipped, the letter of credit would be honored and the proceeds paid to Equibank. The specific amount used to purchase the inventory would be paid and the balance deposited into an IMPS account.

In 1983, Howard and Tom Hammonds formed a manufacturing company named Export International, Inc. ("Export"). The Hammonds each owned 25% of the stock, and Carl Slear owned 50% of the shares. Export was the primary manufacturer of products sold by IMPS. In December 1984, Export changed its name to Custom Structures, Inc.

By letter dated March 21, 1984, Commerce (now Sovran Bank/Central South) agreed to be substituted for Equibank as the lender. On April 19, 1984, the SBA issued an Amended Authorization, substituting Commerce for Equibank, and sent the loan agreement.

By letter dated May 21, 1984, Commerce requested that the SBA correct a typographical error changing the date of the authorization to December 29, 1983, and asked that an "on demand" clause be added to the note.

The closing occurred on June 14, 1984. Several significant events followed. By letter dated October 31, 1985, Susan Thompson, the controller for both IMPS and Export, sent Commerce a copy of a purchase order from a company called SEDCO in the amount of $286,845, together with a purchase order from IMPS to Export covering the order. Ms. Thompson requested that Commerce advance $200,000 of the amount of the purchase order directly to IMPS's account at Commerce.

On November 1, 1984, Ms. Thompson, as controller for Export, drew two checks payable to IMPS totalling $20,000. Export's account, however, had insufficient funds, so the checks were paid from the proceeds of the $200,000 disbursement to IMPS.

On December 1, 1984, Howard Hammonds learned that the SEDCO order was reduced from $286,845 to $152,000. New purchase orders were issued by IMPS to

Export, reflecting the reduced amount of the order. Mr. Hammonds maintains that he was informed that the order was merely to be divided into two parts, with the balance to be ordered later.

On December 9, 1984, Ms. Thompson forwarded an additional purchase order to Commerce from another company called Yathrib Trading and Industrial Corp. in the amount of $35,500, as well as a purchase order from IMPS to Export in the amount of $23,000. She requested that $20,000 be advanced directly to Export. At the time this request was made, IMPS did not notify Commerce of the earlier reduction in SEDCO's order. The draw was actually made on January 2, 1985.

While these events were taking place, by letter dated December 19, 1984, Commerce advised IMPS that a review of its June 30, 1984 financial statement raised a number of questions regarding the financial stability of the company and its adherence to the provisions of the SBA loan agreement.

On January 11, 1985, Howard Hammonds met with several representatives of Commerce in Nashville, Tennessee. As a result of that meeting, on January 31, 1985, Commerce declared that IMPS was in default and that no further funding would be available unless it received adequate assurances of financial stability. Upon receipt of the default notice, Howard Hammonds informed Gary Neenan of Commerce that he would not be requesting any further draws under the line of credit.

On February 8, 1985, Howard Hammonds filed for bankruptcy.

On February 21, 1985, various Bank employees and officials of the SBA went to the IMPS facilities in Butler, Pennsylvania. At that meeting, they examined the December 31, 1984 financial statement which reflected that the company had a negative net worth of $198,858, and that during a six month period the company had lost approximately $87,351 and 12% of its sales. Howard Hammonds again informed Commerce that he would not be drawing on the credit line.

Plaintiff Carlotta M. Bohm, as trustee for debtors Howard Hammonds and IMPS, filed this case on September 4, 1987. The complaint contains claims for breach of the covenant of good faith and fair dealing, breach of fiduciary duty, fraud, duress, and breach of contract. For the following reasons, all claims except the breach of contract claim will be dismissed.

## DISCUSSION

### A. CHOICE OF LAW

Commerce suggests that Tennessee law should be applied. It does not point to any conflict between Tennessee and Pennsylvania law applicable to this case, however. Further, there is no significant difference between the relevant laws of those states. Therefore, the choice of law issue need not be addressed.

### B. SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

When deciding a motion for summary judgment, it is not the court's function to weigh the evidence and determine the truth of the matter, but rather simply to determine whether there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party has the burden to identify those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The nonmoving party then must go beyond the pleadings and use affidavits, depositions, answers to interrogatories and admissions on file to designate facts establishing a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

Commerce offers numerous arguments in support of its motion for summary judgment. They will be addressed in turn.

1. *Claims on Behalf of Howard Hammonds*

Commerce asserts that Howard Hammonds' bankrupt estate has no actionable claim against it because as a shareholder and director of IMPS, Mr. Hammonds cannot maintain an individual cause of action to redress the alleged injuries of IMPS.

■ It is well established that a shareholder, director, officer, or employee of a corporation has no personal or individual right of action against third persons for damages that result indirectly to the individual because of an injury to the corporation. *Pitchford v. PEPI, Inc.*, 531 F.2d 92, 97 (3d Cir.1975), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976). One exception to this general rule is where there is a special duty between the alleged wrongdoer and the shareholder. *Cole v. Ford Motor Co.*, 566 F.Supp. 558, 569 (W.D.Pa.1983). This exception, however, applies most often where there is a fiduciary relationship. *Id.*

■ Plaintiffs have failed to present any evidence that a fiduciary relationship existed between Mr. Hammonds and Commerce. The fact that Mr. Hammonds was the guarantor of the loan does not create a personal right of action independent of the harm allegedly suffered by IMPS. *See Temp–Way Corp. v. Continental Bank*, 139 B.R. 299, 317 (E.D.Pa.1992). Therefore, all claims that the estate of Howard Hammonds asserts against Commerce must be dismissed.

In the remainder of this opinion, "plaintiff" will refer only to Carlotta M. Bohm as trustee for IMPS.

### 2. *Claims on Behalf of IMPS*
#### a. Breach of Contract

Commerce argues that under the terms of the contract, plaintiff does not have a cause of action for its failure to fund subsequent to December 29, 1984. Commerce relies on the following provision of the contract:

> 2(b) First disbursement of the loan being made not later than FOUR months from the date of this Authorization, and no disbursements being made later than TWELVE months from the date of this Authorization, unless such time is extended pursuant to prior written consent of SBA.

Complaint, Ex. F. Commerce argues that since the authorization was dated December 29, 1983, they had no obligation to fund after twelve months from that date, or after December 29, 1984.

Further, Commerce asserts that the terms of the demand clause in the SBA Authorization permitted them to discontinue funding at any time. Specifically, Commerce points to the provision of the contract which makes the authorization contingent upon:

> 2(c) Receipt by lender of evidence satisfactory to its sole discretion, that there has been no unremedied adverse change since the date of the application,....

Complaint, Ex. F. Commerce argues that the financial statements of IMPS reflected a deteriorating financial condition and, based upon this condition, it was within its "sole discretion" to discontinue funding.

Plaintiff replies that this court should not rely on the express language of the contract because of its ambiguity. As evidence of this ambiguity, plaintiff offers the following deposition testimony of James Keller, vice president of Commerce and primary loan officer:

> This transaction was not a black-and-white transaction. The SBA agreed and we agreed that they did not know how this loan was supposed to work because they hadn't done one.
>
> So, you know, in discussions with the SBA, the basic statement that we got was let's make it work and run it in a way that will make this thing work so that they would have an idea of how to do these things going forward.
>
> The way it was to work was that, and when you look, read through the authorization, there are inconsistencies in the authorization about the way, what they wanted to happen.

Deposition of James Keller at 36–37. This testamentary evidence alone precludes this court from enforcing the contract as written against IMPS on a motion for summary judgment.

Further, events suggest that collateral agreements existed which would serve to muddy the waters even further. For example, although Commerce maintains that under the terms of the agreement it had no obligation to fund after December 29, 1984, it is undisputed that Commerce made a $23,000 disbursement to IMPS on January 2, 1985. In addition, although Commerce claims that it stopped making disbursements after a review of IMPS's financial statement, Mr. Keller testified that the viability of export companies cannot be determined merely by examining a balance sheet:

> The strength was more on their ability to perform under their contracts than on the balance sheets which depending on what point and time you saw a balance sheet ... the balance sheet on a particular time on an [Export Trading Company] could be totally irrelevant to its ability to pay the debt back.

Deposition of James Keller at 52–53.

These are examples of genuine issues of material fact which preclude summary judgment in favor of Commerce based solely on the terms of the contract.

Commerce also maintains, however, that the breach of contract claim must be dismissed because IMPS breached the contract first when it failed to notify Commerce that there was a material change in the scope of the SEDCO purchase order.

While it is true that one who materially breaches a contract first cannot demand subsequent adherence to the terms of that contract by the other party, *United States*

*ex rel E.C. Ernst, Inc. v. Curtis T. Bedwell & Sons, Inc.,* 506 F.Supp. 1324, 1327 (E.D.Pa.1981), there are genuine issues of material fact as to whether IMPS should have notified Commerce of any such changes, whether IMPS should have remitted any extra funds to Commerce and whether IMPS misappropriated any of the SEDCO funds.

Further, as noted above, there exist serious questions as to the terms of the contract between IMPS and Commerce. Thus, the summary judgment motion on the breach of contract claim must be denied.

### b. Breach of Duty of Good Faith and Fair Dealing

■ Commerce claims that the covenant of good faith and fair dealing does not give rise to an action separate and apart from a contract claim.

Plaintiff acknowledges that "neither the Pennsylvania Courts nor the Tennessee Courts have yet to determine whether a breach of this good faith covenant by a banking facility will provide a distraught debtor with a cause of action [in] tort." Plaintiff's brief in opposition to defendant's motion for summary judgment at 39. Plaintiff argues by analogy, however, that because Pennsylvania courts have repeatedly applied the good faith standard to breaches by insurance companies, it should be applied to creditors. This court disagrees.

In *Creeger Brick and Bldg. Supply, Inc. v. Mid–State Bank and Trust Co.,* 385 Pa.Super 30, 560 A.2d 151 (1989), the Superior Court of Pennsylvania held that a borrower does not have a legally cognizable cause of action against a lending institution which, although it has not violated the terms of its loan agreement, has allegedly failed to deal with its borrower in good faith. The court indicated that the duty of good faith has been recognized in limited situations, such as a franchisor/franchisee relationship and an insurer/insured relationship, but refused to extend its application to the creditor/debtor relationship. *Id.,* 560 A.2d at 153–54. The court stated that a lending institution does not violate a separate duty of good faith by adhering to

its agreement with the borrower or by enforcing its legal and contractual rights as a creditor. *Id.,* 560 A.2d at 154. The duty of good faith imposed upon contracting parties does not compel a lender to surrender rights which it has been given under the terms of its contract. *Id.* A lender has not violated a duty of good faith merely because it has negotiated loan terms which are favorable to itself. *Id.* "As such, a lender generally is not liable for harm caused to a borrower by refusing to advance additional funds, release collateral, or assist in obtaining additional loans from third persons." *Id.*

Therefore, the breach of duty of good faith and fair dealing claim fails as a matter of law.

### c. Fraud

Plaintiff alleges that Commerce made three fraudulent representations. First, Commerce allegedly represented to Hammonds that if the alleged SBA violations could be explained, then the line of credit would be reopened. Second, Commerce allegedly represented that if the SBA modification was executed, then the line of credit would continue. Finally, Commerce allegedly represented to Hammonds that if Commerce applied the letter of credit as it desired, then the line of credit would be reopened.

■ Under Pennsylvania law, a cause of action for fraud includes the following elements: (1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient as a proximate result. *Redick v. Kraft, Inc.,* 745 F.Supp. 296, 300 (E.D.Pa.1990).

A claim for fraud, however, cannot be grounded on a promise to take action in the future. *Redick,* 745 F.Supp. at 301, n. 2. Plaintiff has failed to allege facts sufficient to support a claim of fraud because the mere assertion that Commerce gave the impression that something might happen in the future—the re-opening of the credit

line—is not a sufficient basis to sustain a claim for fraud.

### d. Duress

Commerce claims that the duress claim is spurious because Howard Hammonds denied that he was coerced into signing the modification of the SBA Agreement. He testified as follows:

Q. As I understand it, based upon your testimony, that it was either by virtue of a typographical error or an oversight that the SBA agreement contained in paragraph 6, or whatever it is, a requirement that a letter of credit be in hand before disbursement. Now, subsequently at a meeting that was held in Nashville, a document was executed by you to change that agreement to reflect the true intent of the parties. Is that accurate?

A. Yes it is.

Q. Were you coerced in signing that document?

A. No, sir, I wasn't.

Deposition of Howard Hammonds at 385.

■ Plaintiff asserts that Commerce informed Mr. Hammonds that it would make no more disbursements if he did not agree to sign a modification of the SBA Agreement. Because IMPS could not function without that funding, Mr. Hammonds was compelled to go against his will and inclination and sign the modification.

Under Pennsylvania law, when a contracting party is free to come and go and to consult with counsel, there can be no duress in the absence of threats of actual bodily harm. *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 893 (3d Cir.1975). Although plaintiff claims that Mr. Hammonds was forced to sign the modification of the SBA Agreement against his will and inclination, the above portion of his deposition testimony indicates otherwise. Further, there is simply no evidence that Commerce threatened to harm Mr. Hammonds if he refused to sign the modification. Plaintiffs have simply failed to present any evidence of duress.

Finally, the court notes that plaintiff cannot claim that Commerce used duress when asking Mr. Hammonds to sign a personal guarantee. This is because Mr. Hammonds refused to sign the guarantee. The duress claim will be dismissed.

### e. Breach of Fiduciary Relationship

Commerce asserts that plaintiff cannot maintain a claim for breach of fiduciary relationship because: (1) there are no assertions that such relationship existed, and (2) plaintiff's allegations indicate no more than a debtor/creditor relationship existing between Commerce and IMPS.

■ Plaintiff claims that a fiduciary relationship existed because all of IMPS's cash flow was channeled through Commerce, and IMPS placed trust in Commerce to manage and administer the funds. A fiduciary relationship arises when one party places confidence in another, resulting in the latter party exercising superiority and influence over the former. *Yohe v. Yohe*, 466 Pa. 405, 353 A.2d 417, 421 (1976); *Temp–Way Corp. v. Continental Bank*, 139 B.R. 299, 317 (E.D.Pa.1992). Under Pennsylvania law, however, a lender is not ordinarily the fiduciary of a borrower. *Temp–Way Corp. v. Continental Bank*, at 318.

A lender may owe a fiduciary duty to a borrower if the lender gains substantial control over the borrower's business affairs. *Id.* at 318. Control over the borrower is demonstrated when there is evidence that the lender was involved in the actual day-to-day management and operations of the borrower or that the lender had the ability to compel the borrower to engage in unusual transactions. *Id.*

In this case, there is no evidence that Commerce was involved in the day-to-day operations of IMPS and could force IMPS to engage in unusual transactions. The fact that IMPS placed confidence in Commerce to manage and administer the funds does not create a fiduciary relationship. Similarly, the fact that Commerce gave advice, particularly regarding international transactions, to IMPS does not establish a fiduciary relationship. "The mere monitoring of the borrower's operations and the proffering of management advice by lenders, without more, does not constitute con-

trol." *Id.* Therefore, plaintiff's breach of fiduciary relationship claim will be dismissed.