In re COMPUTER PERSONALITIES
SYSTEMS, INC., Debtor.

Lawrence Lichtenstein, Trustee for the
Estate of Computer Personalities
Systems, Inc., Plaintiff,

v.

MBNA America Bank, N.A., Defendant.

Bankruptcy No. 01–14231DWS.
Adversary No. 02–0581.

United States Bankruptcy Court,
E.D. Pennsylvania.

Sept. 26, 2002.

Edmond M. George, Obermayer, Rebmann, Maxwell & Hippel, LLP, Philadelphia, PA, for Plaintiff.

Paul M. Hummer, Saul Ewing LLP, Philadelphia, PA, for Defendant.

Dave P. Adams, Philadelphia, PA, United States Trustee.

1. For the sake of convenience, I will refer herein to the allegations and counts at issue in the Amended Complaint but my ruling on the Motion will pertain to the original Complaint since the Amended Complaint has not yet been filed.

*MEMORANDUM OPINION*

DIANE WEISS SIGMUND,
Bankruptcy Judge.

Before the Court is defendant MBNA America, N.A.'s ("MBNA") Motion to Dismiss Counts II through VII of Plaintiff's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). The plaintiff Lawrence Lichtenstein, Trustee (the "Trustee") of the estate of Computer Personalities Systems, Inc. ("CPSI"), responded to the Motion by, *inter alia,* attaching a proposed Amended Complaint that he contends would cure deficiencies, if any, in the claims as originally pled. The parties agree that for the purpose of judging whether the Trustee has stated claims for which relief may be granted, I may review the Amended Complaint since if a complaint can be cured by amendment, the amendment would be allowed in lieu of dismissal.[1] Based on that review, the memoranda filed by the parties and argument made at the hearing conducted on July 16, 2002, I grant the motion in part.

**BACKGROUND**

CPSI was formerly engaged in the business of retail computer sales generating business through direct retail store sales and television infomercials. Amended Complaint ¶ 8. On or about July 2, 1999, CPSI and MBNA entered into a Sales Finance Agreement (the "Agreement") with a term of approximately three years.[2] *Id.* ¶ 10 & Agreement (attached to the Amended Complaint as Exhibit A) ¶ 11. Pursuant to the Agreement, MBNA agreed to provide financing to CPSI cus-

2. The terms of the Agreement provide that it "shall be governed by and subject to the laws of the State of Delaware[.]" Agreement ¶ 12.

tomers to purchase CPSI products. MBNA customers could get instant loan approval at the time of placing an order, and unused credit could be used for other purposes. Amended Complaint ¶¶ 11, 12. Pursuant to the Agreement, CPSI agreed to use MBNA as the sole provider of financial service products and to refrain from referring its customers to any other such provider. *Id.* ¶ 13. Also pursuant to the Agreement, CPSI included in its infomercials transmitted nationally "information about the 'partnering' with MBNA, whereby CPSI advertised that customers could finance their purchases through loans made by MBNA." *Id.* ¶¶ 14, 15.

Under the Agreement, MBNA advanced proceeds of its loans to its customers to CPSI's accounts. *Id.* ¶ 16. CPSI was responsible for payment to MBNA of refunds arising from cancellation of customer purchases from CPSI or the return of all or part of the computer but had no responsibility for the repayment of the customer loans. *Id.* ¶¶ 21. Almost from the outset CPSI had financial difficulties and was failing to deliver computers as purchased. *Id.* ¶¶ 22, 23. CPSI failed to comply with Pennsylvania and federal consumer protection laws that prohibit a vendor from charging a consumer for a product before it is shipped. *Id.* ¶ 24. The Trustee contends that MBNA was aware of CPSI's premature billing practices and the increasing customer complaints about the untimely computer deliveries and took no action "to rectify the manner in which CPSI did business." *Id.* ¶¶ 24, 25, 26, 28, 31, 32. As a result of CPSI's manner of doing business, "MBNA asserted that

CPSI had incurred refund obligations to MBNA." *Id.* ¶ 29. MBNA began issuing chargebacks and reducing the funding of customer loans, "further exacerbating CPSI cash flow problems, of which MBNA was aware." *Id.* ¶ 30.

During the summer of 2000, CPSI's cash flow problems and customer complaints about undelivered computers continued to grow. *Id.* ¶¶ 36–41. While MBNA continued to offer loans to CPSI customers, it began to insist on CPSI funding a weekly reserve from which it could deduct its claimed losses. *Id.* ¶ 44. On or about December 28, 2000, MBNA "forced an amendment" to the Agreement (the "Addendum") which obligated CPSI to establish a reserve account as "security for MBNA America's losses arising from Unresolved Customer Disputes and as consideration for MBNA extending additional credit to approved CPSI Customers." Addendum (included as part of Exhibit A to the Amended Complaint) ¶ 3.

During the 90 day period prior to the commencement of the bankruptcy case, CPSI made transfers to MBNA that allegedly included certain improper chargebacks and setoffs taken by MBNA. Amended Complaint ¶ 51. The Trustee seeks to recover these transfers, damages and costs under various theories. MBNA's Motion is directed at the following counts as numbered in the Amended Complaint:[3] Count II—Fraudulent Conveyances Pursuant to 11 U.S.C. § 548; Count III—Fraudulent Conveyances Pursuant to 11 U.S.C. § 544; Count V—Recovery of Fraudulent Transfers Under 11 U.S.C. § 550;[4] Count VI—Contribution;[5]

---

**3.** The Amended Complaint also contains the following counts which are not at issue here: Count I—Avoidance and Recovery of Preferential Transfers Pursuant to 11 U.S.C. § 547; Count IV—Avoidance of Setoffs Pursuant to 11 U.S.C. § 553(b); and Count IX—Indemni-

fication. The original Complaint did not contain Counts IV or IX.

**4.** Count V of the Amended Complaint is Count IV in the original Complaint.

**5.** Count VI of the Amended Complaint is

Count VII—Breach of Agreement;[6] and Count VIII—Equitable Subordination.[7] MBNA's arguments for dismissal can be summarized as follows:

A. Counts II and III, which attempt to allege fraudulent transfer claims, should be dismissed for failure to state a claim because the only transfers made by CPSI were in repayment of a commercial debt pursuant to the parties' Agreement and as such cannot be "fraudulent transfers." Moreover, if Counts II and III do not state a claim, then it follows that the Trustee's claim under 11 U.S.C. § 550 (Count V in the Amended Complaint) which is premised upon the finding of a fraudulent transfer must likewise fail.

B. Count VI, which purports to state a claim for contribution should be dismissed for failure to state a claim because: (1) the parties were not involved in a joint venture; and (2) the doctrine of *in pari delicto* forecloses tort liability in this case.

C. Count VII which seems to aver that MBNA breached the Agreement by entering into the Addendum, fails to state a breach of contract since modification of and subsequent compliance with the terms of an agreement do not constitute a breach of contract claim; and

D. Count VIII fails to state a valid cause of action for equitable subordination because Plaintiff has failed to allege that MBNA engaged in some type of inequitable conduct.

Count V in the original Complaint.

**6.** Count VII of the Amended Complaint is Count VI in the original Complaint.

**7.** Count VIII of the Amended Complaint is Count VII in the original Complaint.

## DISCUSSION

### I.

The Third Circuit Court of Appeals has stated that in considering a Rule 12(b)(6)[8] motion to dismiss, a court must accept all allegations in the complaint, and all reasonable inferences that can be drawn therefrom, as true and view them in the light most favorable to the non-moving party. *See Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3rd Cir.1989) (citations omitted); *Angelastro v. Prudential–Bache Securities, Inc.,* 764 F.2d 939, 944 (3rd Cir.), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985). A complaint must not be dismissed for failing to state a claim unless it appears beyond reasonable doubt that plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. *See City of Philadelphia v. Lead Industries Ass'n, Inc.,* 994 F.2d 112, 118 (3d Cir.1993)(*citing Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

### II. Fraudulent Transfer Claims

MBNA contends that the Trustee's fraudulent transfer claims are precluded because the transfers at issue were in repayment of a debt which CPSI was obligated to pay MBNA under the Agreement and Addendum. MBNA asserts that "[a]s a matter of law, the repayments of debts to a bona fide creditor are not fraudulent conveyances." Defendant MBNA America's Memorandum of Law in Support of its Motion to Dismiss Counts II through VII of Plaintiff's Complaint ("MBNA's Brief") at 4. In support of this proposition, MBNA cites *In re Miller,* 39 F.3d 301, 307 (11th Cir.1994) (transfer of property to

**8.** Fed.R.Civ.P. 12(b)(6) is applicable here pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure.

debtors' largest creditor, in exchange for cancellation of unsecured debt, was not "tantamount to a fraudulent transfer" since the transfer was to a bona fide creditor and the debtors' "motivation in effecting the transfer was to obtain funds to keep their businesses alive while satisfying their largest creditor[.]"), and *In re Erie Marine Enterprises, Inc.*, 216 B.R. 529, 537–38 (Bankr.W.D.Pa.1998) (granting summary judgment in favor of creditor on actual fraud theory under § 548(a)(1) and stating that "[i]t is difficult to perceive how the payments made by the Debtor to [the creditor] on a debt which was justly owed can be tortured into an act done with the intent to hinder, delay and defraud creditors.").

I am unpersuaded by MBNA's argument because it rests on the assumption that MBNA is a bona fide creditor. While that assumption may be proven to be true during the course of this litigation, at this stage of the proceeding (*i.e.*, a motion to dismiss) I must accept as true all allegations in the complaint and draw all reasonable inferences therefrom in the light most favorable to the Debtor. The Trustee has included allegations in the Complaint which suggest that MBNA may not have been a bona fide creditor vis-a-vis the Ad-

dendum and the transfers made pursuant thereto. For example, the allegations in the Amended Complaint suggest that CPSI was "forced" to agree to the Addendum. *See* Amended Complaint ¶ 50. Moreover, the Amended Complaint, while not specifically identifying the chargebacks and setoffs alleges that MBNA obtained them "improperly." *See id.* ¶ 51. The Trustee has also alleged that the Debtor acted with "actual intent to hinder, delay and defraud its present or future creditors." *See id.* ¶ 67. While the Trustee may ultimately be unable to prove these allegations,[9] at this stage of the proceeding the allegations are sufficient to withstand MBNA's motion to dismiss. *See Fisher v. American National Bank and Trust (In re Elite Marketing Enterprises, Inc.)*, 2001 WL 1669229, at *3 (Bankr.N.D.Ill. Dec. 13, 2001) (concluding that since trustee had alleged actual intent to defraud, he made sufficient allegations of defendant's actual intent to withstand a motion to dismiss despite defendant's argument that "the facts alleged show that no [fraudulent] intent could have existed for various reasons and that the 'only plausible inference' from the loan documents is that there was no intent by the debtor to defraud the creditors.").

9. In order to prove a fraudulent conveyance, it is "insufficient to show only that a transfer had the *effect* of defrauding certain creditors or that the transfer was made in preference to other creditors[.]" *Stratton v. Equitable Bank*, 104 B.R. 713, 726 (D.Md.1989) (quoting *In re Prestige Spring Corp.*, 628 F.2d 840, 842–43 (4th Cir.1980)), *aff'd*, 912 F.2d 464 (4th Cir.1990). Rather, " 'actual intent' to defraud must be shown." *Id. See also In re Cushman Bakery*, 526 F.2d 23, 32 (1st Cir. 1975) (noting that "[a]lthough every preferential payment to a creditor has the effect of hindering or delaying other creditors from collecting their judgments, ... granting a security interest to secure funds with which the debtor intends to pay a preexisting debt does

not necessarily imply an intent to 'hinder, delay or defraud creditors'[.]"); *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 831 (1959) ("Although a transfer may have the effect of hindering or delaying or defrauding creditors, incidental effect is not enough to satisfy the requirements of actual intent to defraud."); *In re Decker*, 295 F.Supp. 501, 515 (W.D.Va.1969) (recognizing well-settled law that a conveyance made in good faith, whether for an antecedent debt or a present consideration, is not forbidden even though it may have the effect of hindering or delaying creditors by removing from their reach assets of the debtor), *aff'd*, 420 F.2d 378 (4th Cir. 1980).

## III. Claim for Contribution

The bases of the Trustee's claim for contribution are twofold. First, he alleges that MBNA was a joint venturer with CPSI and that, as a joint venturer, MBNA is jointly liable with CPSI for all debts incurred by the joint venture. *See* Amended Complaint ¶¶ 94–96; Memorandum of Law in Opposition to the Motion of MBNA America Bank, N.A., to Dismiss Counts II through VII of the Trustee's Complaint ("Trustee's Brief") at 8–14. Second, he alleges that to the extent that CPSI is held liable in a suit commenced against it by the Commonwealth of Pennsylvania for alleged consumer law violations, MBNA, who "was an active participant in the alleged violations of [c]onsumer [l]aws," is jointly liable, as a joint tortfeasor under Pennsylvania or Delaware statutory law, for such debt. *See* Complaint ¶¶ 97–107; Trustee's Brief at 14–16. MBNA argues that the Trustee's claim for contribution must be dismissed because: (i) it fails to state a claim based upon a joint venture theory; and (ii) the *in pari delicto* doctrine equitably estops the Trustee from recovering contribution from MBNA under any tort theory.

### (i) Joint Venture Theory

Under Delaware law, which the parties agreed would govern the Agreement, *see supra* at n. 2, the elements of a joint venture are:[10] (1) a community of interest in the performance of a common purpose; (2) joint control or right of control; (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits; and (5) a duty to share in the losses which may be sustained.[11] *Warren v. Goldinger Brothers, Inc.*, 414 A.2d 507, 509 (1980); *Wah Chang Smelting and Refining Company v. Cleveland Tungsten, Inc.*, 1996 WL 487941, at *4 (Del.Ch. Aug. 19, 1996). MBNA contends that the Amended Complaint fails to allege that the parties had a right to share in the profits.[12] The Trustee disagrees, asserting that profit sharing is alleged because the Agreement required MBNA to make royalty payments to CPSI.

Paragraph 1(a) of the Agreement defines "Royalties" as "the compensation set

---

**10.** Over forty years ago, the Supreme Court of Delaware described a joint venture as "an enterprise undertaken by several persons jointly to carry out a single business enterprise, not amounting to a partnership, for their mutual benefit, in which they combine their property, money, effects, skill and knowledge." *J. Leo Johnson, Inc. v. Carmer*, 38 Del.Ch. 579, 584, 156 A.2d 499, 502 (1959).

**11.** The Trustee contends that Pennsylvania law rather than Delaware law governs the issue of whether a joint venture has been alleged because "the existence of a joint venture turns on the entire relationship between the parties." Trustee's Brief at 9 n. 3. Nevertheless, the Trustee asserts that his "position would be no different, if this court were to apply Delaware law to the facts of this case." *Id.* at 9, 156 A.2d 499. Given this assertion, I will apply Delaware law here. I note that, under the law of Pennsylvania, the following factors are viewed as "essential" to a joint venture: (1) each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money; (2) profits must be shared among the parties; (3) there must be a "joint proprietary interest and right of mutual control over the subject matter" of the enterprise; and (4) usually, there is a single business transaction rather than a general and continuous transaction. *Newlin Corporation v. Department of Environmental Resources*, 134 Pa.Cmwlth. 396, 579 A.2d 996 (1990) (*quoting Snellbaker v. Herrmann*, 315 Pa.Super. 520, 526–27, 462 A.2d 713, 716 (1983)). Thus, under both the law of Delaware and the law of Pennsylvania, a sharing of profits is an element of a joint venture.

**12.** MBNA also asserts that the Complaint fails to allege a joint proprietary interest or joint control. Based on my conclusion that the Complaint fails to allege a sharing of profits, it is unnecessary for me to address these points.

forth in Schedule B." Agreement ¶ 1(*l* ). Schedule B obligated MBNA to pay CPSI "50 basis points (fifty one hundredths of one percent) . . . of all *retail purchase charges* for CPSI Products made directly to a Loan Account . . . generated by Customers using a Loan Account" and "300 basis points (three percent) of all *periodic rate finance charges* assessed . . . which are generated by Customers using a Loan Account." Agreement, Paragraph B (italics added).[13] Paragraph 7 of the Agreement also addressed the royalty payments, stating in relevant part:

> 7. *Royalties*
>
> (a) *Duration:* During the term of this Agreement, MBNA America shall pay Royalties to CPSI. Royalties shall not be paid without a completed Schedule D (IRS Form W–9), which is necessary to enable MBNA America to report compensation paid to CPSI to the appropriate tax authorities in a timely manner. Except as otherwise provided in Schedule B, payment of Royalties then due shall be made approximately forty-five (45) days after the end of each calendar quarter.
>
> (b) *Reports:* On or before the forty-fifth (45th) day after the end of each calendar quarter during the term of this Agreement, MBNA America will provide CPSI with a statement showing the direct retail purchase dollar volume and finance charge dollar volume . . . . made during the preceding calendar period. Reports shall be made in a form substantially similar to the statement attached as Exhibit 3 hereto.

Agreement ¶ 7. The Trustee argues that since "CPSI had a vested interest in the revenues being generated by the Agreement and the loan accounts obtained through the Program" that "there was an agreement as to the sharing of profits, in the form of royalties paid to CPSI." Trustee's Brief at 10. I respectfully disagree.

The royalty payments which MBNA was obligated to pay CPSI did not constitute profit sharing. The royalty payments were tied to the amount of retail purchase charges and the periodic rate finance charges generated by customer loan accounts and not to the amount of profit, if any, which MBNA made from the loan accounts. The royalty payments, in essence, constituted periodic payments which MBNA was obligated to make to CPSI as compensation for the loan accounts which MBNA acquired as a result of their contractual arrangement regardless of whether MBNA profited from the accounts. In discussing joint ventures, the Court of Appeals of Colorado aptly stated the following:

> The primary attribute and necessary condition for a partnership is the element of joint, not several, profit sharing.

13. Schedule B states:

ROYALTY ARRANGEMENT

During the term of this Agreement, MBNA America will pay CPSI a Royalty calculated as follows, for those accounts with active charging privileges. All Royalty payments due hereunder are subject to adjustment by MBNA America for any prior overpayment of Royalties by MBNA America:

*Gold Option Accounts*

1. 50 basis points (fifty one hundredths of one percent) of all retail purchase charges for CPSI Products made directly to a Loan Account (excluding transactions that relate to credits, other purchases, unauthorized transactions and all other non-purchase charges and fees) generated by Customers using a Loan Account.

2. 300 basis points (three percent) of all periodic rate finance charges assessed (excluding finance charges that are subsequently credited and/or generated from refunds, returns or unauthorized transactions) which are generated by Customers using a Loan Account.

Agreement, Schedule B.

This element, however, is not present if one of the parties to the alleged joint venture receives a fixed sum, irrespective of the venture's profits or losses, or if one of the parties could have enjoyed an individual profit, while the other might have sustained an individual loss. *Batterman v. Wells Fargo Ag Credit Corp.*, 802 P.2d 1112, 1117 (Colo.Ct.App. 1990) (citations omitted).[14] While CPSI was not entitled to receive a fixed sum from MBNA, it was entitled to receive the royalty payments from MBNA irrespective of whether it made profits.

■ A review of the allegations in the Complaint and the terms of the Agreement reveals that CPSI and MBNA joined together in a contractual relationship designed to further each of their interests but that there was no agreement between them to share profits. As the court stated in *Hatch v. V.P. Fair Foundation, Inc.*, 990 S.W.2d 126 (Mo.Ct.App.1999), "[t]he mere fact that both parties have an economic interest in the activity does not make them joint venturers. The community of pecuniary interests requires that the parties have a right to share in the profits and a duty to share in the losses." *Id.* at 138 (citations omitted). *See also First National Bank at Paris v. Adair*, 42 Ark.App. 84, 854 S.W.2d 358, 361 (1993) ("The primary attribute and necessary condition for a joint venture is the element of joint, not several profit sharing."); *L & H Leasing Company v. Dutton*, 82 Ohio App.3d 528, 612 N.E.2d 787, 790 (1992) (noting that "the chief characteristic of a joint venture is a profit jointly sought and

the profit must be joint and not several."); *Colorado Performance Corporation v. Mariposa Associates*, 754 P.2d 401, 405 (Colo.Ct.App.1987) ("although two or more parties may associate together in a venture, each anticipating an individual profit to himself, no partnership is thereby created because the 'chief characteristic of a joint adventure is a *joint* and not a *several* profit.' ").

In *Connor v. Great Western Savings and Loan Association*, 69 Cal.2d 850, 73 Cal.Rptr. 369, 447 P.2d 609 (1968), the plaintiffs, who had purchased homes in a development tract, sought damages from Great Western Savings and Loan Association, a lender which had financed the acquisition of the land and provided construction loans for the homes, based on the theory that it had participated in the development of the tract with the defendant, Conejo Valley Development Company, which had built and sold the homes. In rejecting this theory, the California Supreme Court opined:

> Although the evidences establishes that Great Western and Conejo [referring to the defendants who allegedly formed a joint venture] combined their property, skill, and knowledge to carry out the tract development, that each shared in the control of the development, that each anticipated receiving substantial profits therefrom, and that they cooperated with each other in the development, there is no evidence of a community or joint interest in the undertaking. Great Western participated as a buyer and seller of the land[15] and lender of funds,

---

**14.** This decision and the ones that are discussed below in this section were rendered under state laws that also require the existence of profit sharing as an essential element of a joint venture and are therefore useful in understanding the circumstances where profit sharing is found.

**15.** Apparently, the lending arrangement for the purchase of the tract of land involved a practice referred to as "land warehousing" in which "a financial institution holds land for a developer until he is ready to use it." *Connor v. Great Western Savings and Loan Association*, 73 Cal.Rptr. 369, 447 P.2d at 613. As a

and Conejo participated as a builder and seller of homes. Although the profits of each were dependent on the overall success of the development, neither was to share in the profits or the losses that the other might realize or suffer. Although each received substantial payments as seller, lender, or borrower, neither had an interest in the payments received by the other. Under these circumstances, no joint venture existed.

73 Cal.Rptr. 369, 447 P.2d at 615 (citations omitted) (footnote added).

Similarly, in *Dority v. Driesel,* 75 Or. App. 180, 706 P.2d 995 (1985), the plaintiffs who had purchased a home from Driesel, a builder, sought to recover against Daon Corporation ("Daon"), which had developed the residential subdivision upon which the home had been built, for defects in the home under the theory that a joint venture existed between Driesel and Daon. The plaintiffs had become interested in purchasing the home while it was being built in conjunction with a "Showcase of Homes" which Daon was sponsoring as a marketing scheme for its subdivision. The showcase project involved six builders, including Dreisel, who purchased lots from Daon and built custom homes of their own design. Daon was responsible for promoting and advertising the project, decorating and furnishing the model homes and providing an appropriate landscaping plan to the builders. While Doan had on-site personnel to discuss lot sales with prospective purchasers, Driesel retained his own broker for the sale of the home he was building. In ruling that there was no joint

venture between Daon and Driesel, the Oregon Court of Appeals explained:

The profits anticipated by Daon and Driesel to be derived from the showcase were· not to be shared jointly. Rather, each was hoping to enjoy a distinct form of gain independent of that of the other. Indeed, either one might profit from the showcase while the other failed to receive any benefit at all. The fact that parties act in concert to achieve some economic objective, while relevant to the inquiry, is not enough to create a joint venture.

*Id.* at 998 (citations omitted).

I find these two cases instructive on the matter at hand. While CPSI and MBNA joined together in a contractual arrangement designed to benefit each of them and further each of their economic interests, they did not, based on the allegations in the Amended Complaint and the terms of the Agreement, agree to share profits from the arrangement. Since profit sharing has not been alleged in the Complaint, the Trustee has failed to state a claim against MBNA for contribution based on a joint venture theory. *See Talley Brothers, Inc. v. Ford Motor Company,* 1992 WL 240341, at *2 (Del.Super.Ct. September 16, 1992) ("Profit-sharing is the main ingredient of a joint venture.").

### (ii) *In Pari Delicto* Doctrine

The *in pari delicto* doctrine "provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." [16] *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,* 267 F.3d 340 (3d Cir. 2001). *See also Official Committee of*

---

result of this arrangement, Great Western acted as a buyer and seller of the land.

**16.** In *Mantilla v. United States,* 302 F.3d 182, n. 2 (3d Cir.2002) (*quoting United States v. Farrell,* 606 F.2d 1341, 1348 & n. 21 (D.C.Cir. 1979)), the Third Circuit explained that "[a]l-

though commonly referred to as *in pari delicto,* the concept's full title is *in pari delicto potior est conditio defendentis,* meaning 'in case of equal fault the condition of the party defending is the better one.' "

*Unsecured Creditors v. Austin Financial Services, Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 518 (Bankr.S.D.N.Y.1999) (*quoting* 1 Am.Jur.2d Actions § 46 (1994)) (explaining that the *in pari delicto* doctrine provides that "wrongdoers ought to each bear out the consequences of their wrongdoing without legal recourse against each other.'").

MBNA argues that the *in pari delicto* doctrine bars the Trustee, who stands in the shoes of the Debtor, from recovering on a claim for contribution since the complaint "alleges numerous acts of wrongdoing by CPSI." MBNA's Brief at 8. In support of this argument, MBNA cites *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc., supra.* The Trustee contends that the aforementioned case is distinguishable from the instant case because the claim at issue here is one for contribution.[17] In his claim in the Amended Complaint, the Trustee alleges that the Commonwealth of Pennsylvania has sued CPSI for alleged violations of consumer laws, that MBNA was an active participant in and encouraged CPCI's business practices and that, *to the extent CPSI is held liable* for consumer violations, that MBNA should be held jointly liable as a joint tort-feasor. Amended Complaint ¶¶ 99–107 (emphasis added).

Under the common law of Delaware, no right to contribution existed among tort-feasors. *Lutz v. Boltz*, 48 Del. 197, 199, 100 A.2d 647, 647 (1953) (recognizing that "[p]rior to 1949 [when the statute permitting contribution among joint tort-feasors was enacted], no right of contribution existed between joint-tortfeasors in [Delaware]."). Under the common law of Pennsylvania, contribution among joint tort-feasors was generally allowed but with certain exceptions. *See Goldman v. Mitchell–Fletcher Co.*, 292 Pa. 354, 359, 141 A. 231, 233 (1928); *Geraci v. Lerner*, 18 Pa. D. & C. 112, 114, 1932 WL 3571 (1932). However, this case law yielded to the enactment in both states of statutes permitting contribution among joint tort-feasors. Thus, contribution among joint tort-feasors is a right conferred under the statutes of both Pennsylvania and Delaware which specifically allow recovery by one wrongdoer against another when both are liable in tort for the same injury to persons or property. *See* 10 Del. C. §§ 6301, 6302; 42 Pa.C.S.A. §§ 8322, 8324.[18]

---

**17.** In *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc, supra*, on which MBNA relies, the creditors' committee, which had been authorized to pursue litigation on behalf of the debtors' estates and, therefore, stood in the shoes of the debtors, brought federal securities and state common law claims against third parties for "fraudulently inducing [the debtor] corporations to issue ... debt securities, thereby deepening their insolvency and forcing them into bankruptcy." 267 F.3d at 344. Those claims for harm to the debtors were held barred by the doctrine of *in pari delicto* based on fraudulent conduct of the debtors' principals which was imputed to the debtors. The case thus involved an affirmative claim on behalf of wrongdoers for damages to themselves. On the other hand, a contribution claim allows a party to recover from a joint tort-feasor its proportionate share of the damages awarded against it and in favor of the innocent party. Indeed a "joint tort-feasor is not entitled to a money judgment for contribution until he has by payment discharged a common liability or has paid more than his pro rata share thereof." 42 Pa.C.S.A. § 8324(b). *See also* 10 Del. C. § 6302. Accordingly, contribution is only available to tort-feasors who have made payment to a plaintiff for wrongdoing to that plaintiff. The right of contribution thus serves a distinct purpose, allowing the innocent injured person to recover against either of two (or more) joint tort-feasors without regard to the allocation of responsibility which is left to the wrongdoers to address *inter se.*

**18.** In *Anstine v. Pennsylvania R. Co.*, 352 Pa. 547, 549, 43 A.2d 109, 110 (1945), the Pennsylvania Supreme Court recognized that its

The Trustee argues that if a party's wrongdoing is a bar to a suit for contribution, the statutes recognizing the right of contribution are rendered ineffectual. This argument is persuasive. Clearly any party's entitlement to invoke the right of contribution is premised on that party being liable for some wrongdoing. To apply the *in pari delicto* defense as MBNA demands would amount to judicial abrogation of a legislative enactment. Since the statutes are specifically designed to allow one wrongdoer to recover from another, it would be counterintuitive to apply the *in pari delicto* doctrine to bar such claims and, consequently, the Trustee's claim will not be dismissed on that basis. Thus, the Trustee's claim for contribution will survive MBNA's Motion on his joint tortfeasor theory. In so ruling, I am not commenting upon or making any determination regarding other issues which may exist regarding the validity of the Trustee's claim for contribution under the aforementioned theory since, at this time, no other arguments have been raised by MBNA. I note that, in order to recover under his claim for contribution based on this theory, the Trustee will have to establish the applicability of one of the aforementioned state statutory provisions and that MBNA is a joint tort-feasor with CPSI (*i.e.*, that MBNA is liable in tort for the same injury to persons or property as CPSI).

### IV. Breach of Contract Claim

■ Citing Pennsylvania and Delaware law for the proposition that the "[m]odification of and subsequent compliance with the terms of an agreement does not constitute a breach of contract," MBNA argues that the Trustee's claim for breach of contract should be dismissed because it does no more than allege that MBNA breached the Agreement by entering into the Addendum and acting in compliance with it. MBNA's Brief at 8–9.[19] I do not find the Trustee's allegations so limited. While the breach of contract claim, even as originally pled, alleges that MBNA improperly insisted on amendments to the agreement, it *also* alleges that MBNA breached the Agreement by failing to "advance moneys loaned to consumers which it knew was to be used by the Debtor to purchase consumer equipment" and "fund certain loans in order to benefit itself and to reduce its exposure to consumers." Complaint ¶¶ 83–84. In addition, in the Amended Complaint, the Trustee supplemented the allegations in his breach of contract claim. As amended, the claim also alleges that MBNA failed to fund royalty payments due under the Agreement and failed to use its best efforts to determine the legitimacy of consumer disputes. Amended Complaint ¶¶ 112, 116. Consequently, the

---

statute allowing for contribution among joint tortfeasors "originated in equity." *See also Austin Road Co. v. Pope,* 147 Tex. 430, 434, 216 S.W.2d 563, 565 (1949) (recognizing that statutory provision for contribution was enacted to "relieve the rigor of the common law" and "allow enforced contribution among joint tortfeasors who are in *pari delicto* as to each other, and thereby place the burden equally upon all solvent tortfeasors.").

**19.** At the hearing on the Motion, MBNA also argued that the Trustee's breach of contract claim should be dismissed because the allegation that there has been a breach of contract for refusing to fund consumer purchases is inconsistent with allegations underpinning the contribution claim that the funding of the loans was tortious. While there "are limits on the extent to which parties may pursue inconsistent positions in the course of litigation[,]" *see Prousi v. Cruisers Division of KCS International, Inc.,* 1997 WL 793000, at *5 n. 7 (E.D.Pa. December 8, 1997), inconsistent and alternative pleading is allowed at the pleading stage of litigation under Rule 8(e)(2) of the Federal Rules of Civil Procedure, *see* Fed.R.Civ.P. 8(e)(2).

Trustee's claim for breach of contract will not be dismissed.

### V. Equitable Subordination

■ MBNA contends that the Trustee has failed to allege the kind of inequitable conduct necessary to state a claim for equitable subordination and, therefore, that the claim should be dismissed. Section 510(c) of the Bankruptcy Code authorizes equitable subordination, stating, in pertinent part:

> [A]fter notice and a hearing, the court may—
>
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim . . . [.]

11 U.S.C. § 510(c). "The purpose of equitable subordination 'is to undo or to offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results.'" *S & M Sakamoto, Inc. v. Aoki (In re Central Pacific Boiler & Piping, Ltd.),* 81 B.R. 40, (Bankr.D.Hawai'i 1987) (*quoting In re Kansas City Journal–Post Co.,* 144 F.2d 791, 800 (8th Cir.1944)). *See also In re Beck Rumbaugh Associates, Inc.,* 114 B.R. 418, 421 (E.D.Pa.1990) ("The doctrine of equitable subordination permits the bankruptcy court to subordinate a claim in the distribution of the estate where the claimant engaged in inequitable conduct which results in injury to other creditors or confers an unfair advantage on the claimant if the subordination is not inconsistent with the Bankruptcy Code."). " '[E]quitable subordination is an unusual remedy which should only be applied in limited circumstances.'" *Ansel Properties, Inc. v. Nutri/System of Florida Associates (In re Nutri/System of Florida Associates),* 178 B.R. 645 (E.D.Pa.1995) (*citing In re Fabricators, Inc.,* 926 F.2d 1458, 1464 (5th Cir.1991)). *See also Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.),* 161 B.R. 107, 119 (E.D.Pa.1993) ("Equitable subordination has seldom been invoked, much less successfully so, in cases involving non-insiders and/or non-fiduciaries."), *aff'd,* 37 F.3d 1487 (3d Cir.1994) (table).

■ A plaintiff invoking § 510(c) must establish the following three elements: (i) the claimant engaged in some type of inequitable conduct; (ii) the misconduct resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. *Citicorp Venture Capital Ltd. v. Committee of Creditors Holding Unsecured Claims,* 160 F.3d 982, 986–87 (3d Cir.1998). MBNA's motion focuses on the first element, *i.e.,* inequitable conduct.

■ "The quality of conduct that will be deemed 'inequitable' under § 510(c) depends on the nature of the relationship between the debtor and the party whose claim is subject to attack on equitable subordination grounds[.]" *Badger Freightways, Inc. v. Continental Illinois National Bank (In re Badger Freightways, Inc.),* 106 B.R. 971, 976 (Bankr.N.D.Ill.1989). *See also Anaconda–Ericsson, Inc. (In re Teltronics Services, Inc.),* 29 B.R. 139, 169 (Bankr.E.D.N.Y.1983) ("The primary distinctions between subordinating the claims of insiders versus those of non-insiders lie in the severity of misconduct required to be shown, and the degree to which the court will scrutinize the claimant's actions toward the debtor or its creditors."). Where the claimant is an insider or fiduciary of the debtor, the trustee must present evidence of unfair conduct. *Committee of Unsecured Creditors v. Hoopes (In re Pittsburgh Cut Flower Company, Inc.), supra,* 124 B.R. 451, 461 (Bankr.W.D.Pa.

1991). If the trustee meets this burden, "the claimant must then prove the fairness of his transactions with the debtor or his claim will be equitably subordinated." *Ansel Properties, Inc., supra,* 178 B.R. at 657 (*quoting In re N & D Properties, Inc.,* 799 F.2d 726, 731 (11th Cir.1986)). However, where the claimant is not an insider or fiduciary of the debtor, "egregious conduct must be proven with particularity." *Id.; see also Badger Freightways, Inc., supra,* 106 B.R. at 976 (explaining that when "a claimant is not a fiduciary, its claim may still be equitably subordinated, but courts have required the claimant's conduct be much more egregious."). As the Trustee correctly notes, *see* Trustee's Brief at 17, in such cases the plaintiff must establish that the claimant engaged in gross or egregious misconduct "such as fraud, spoliation or overreaching." *Committee of Unsecured Creditors v. Hoopes (In re Pittsburgh Cut Flower Company, Inc.),* 124 B.R. 451, 462 (Bankr.W.D.Pa.1991) (*citing In re N & D Properties, Inc.,* 799 F.2d 726, 731 (11th Cir.1986)). *See also Ansel Properties, Inc., supra,* 178 B.R. at 657 (*quoting In re N & D Properties, Inc.,* 799 F.2d 726, 731 (11th Cir.1986)) (noting that when "the claimant is not an insider or fiduciary, the trustee must prove more egregious conduct such as fraud, spoliation, or overreaching and prove it with particularity."). Since the Trustee has not alleged that MBNA was an insider or fiduciary of the Debtor,[20] his equitable subordination claim is subject to the more demanding standard. MBNA contends that the Trustee's pleading fails to allege facts that, if proven, would satisfy this standard.

While not a model of clarity, the Trustee's pleading essentially alleges that MBNA continued to extend loans to "unwitting" consumers for the purchase of computers from CPSI even though MBNA was fully aware that CPSI was: (i) having cash flow problems which rendered it financially unable to deliver promised computers to customers, *see* Amended Complaint at ¶¶ 23 & 43; and (ii) failing to comply with Pennsylvania and federal law applicable to mail orders "requiring that consumers not be charged for goods and services before their goods were shipped," *id.* ¶ 24. The pleading further alleges that MBNA took certain actions (such as: (i) insisting on the "formation of a reserve" from which it could "recapture customer refunds" and "deduct its claimed losses"; and (ii) forcing the Addendum "by which CPSI agreed to accelerate refund payments by reductions of the funding amounts,") to protect its interest and reduce its losses despite the fact that such actions exacerbated CPSI's cash flow problems and made it impossible for CPSI to purchase and pay for computers which it owed to customers. *Id.* ¶¶ 46–50. In paragraphs 100–103, the pleading alleges:

100. MBNA, though aware of the issues with CPSI, insisted that CPSI continue in its business so that it could reduce its alleged losses under an Addendum, which permitted MBNA to loot CPSI of over $2,000,000.00 which was funded to consumers to buy computers.

101. Under and pursuant to this scheme, MBNA continued to fund loans which it knew would be never be used by CPSI to purchase

---

**20.** In his brief, the Trustee asserts, in conclusory fashion and without citing any legal authority for support, that "MBNA owed a fiduciary duty to its customers which it violated through its actions." Trustee's Brief at 18.

Under Pennsylvania law, "a lender is not ordinarily a fiduciary of a borrower." *Bohm v. Commerce Union Bank,* 794 F.Supp. 158, 164 (W.D.Pa.1992).

computers for the very consumers whose loan proceeds were used to repay MBNA and no others.

102. As a consequence of MBNA's actions, consumer loans were funded by MBNA, and the monies were taken by MBNA without ever reaching CPSI.

103. MBNA's conduct further exacerbated CPSI's financial condition, and caused CPSI to slide deeper and deeper into insolvency.

*Id.* ¶¶ 100–103.

As the Trustee's allegations are worded, they suggest that, despite MBNA's knowledge that CPSI was not financially able to deliver computers ordered from it, MBNA continued to extend loans to "unwitting consumers" and used its leverage against CPSI to insist on procedures which enabled MBNA to substantially reduce its losses at the expense of such consumers and which exacerbated CPSI's financial condition. Depending upon how such allegations are fleshed out, MBNA's conduct could be viewed as egregious. Consequently, while the Trustee may be unable to prove these allegations when he is required to substantiate them with evidence (*e.g.*, at the summary judgment stage), they are sufficient, given the standard applicable to motions to dismiss (*i.e.*, the allegations must be viewed in favor of the non-moving party and the claim should not be dismissed unless it appears that the plaintiff can prove no set of facts in support of the claim that would entitle him to relief), to state a claim for inequitable subordination.

An Order consistent with this Memorandum Opinion shall be entered.

---

**1.** As Plaintiff cannot rely upon the joint venture theory as a basis for his claim for contribution, presumably the proposed Amended Complaint will be modified to exclude that theory of recovery.

---

## ORDER

**AND NOW,** this 26th day of September, 2002, upon consideration of the Motion to Dismiss ("Motion") filed by defendant MBNA America, N.A. and after a hearing with notice and for the reasons set forth in the accompanying Memorandum Opinion;

It is hereby **ORDERED** and **DECREED** that:

1. The Motion is **DENIED** conditioned upon the filing of Plaintiff's Amended Complaint; [1]

2. Plaintiff shall file his Amended Complaint on or before Friday, October 11, 2002.